IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

MATS JARLSTROM, an individual, )
                              )
              Plaintiff, ) Case No. 3:14-cv-00783-AC
                              )
        v.                    )
                              )
CITY OF BEAVERTON, an Oregon  )    August 25, 2014
municipal corporation,        )
                              )
              Defendant. )    Portland, Oregon
_____)

MOTION HEARING

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE JOHN V. ACOSTA

UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

1                           APPEARANCES

2    FOR THE PLAINTIFF:     MICHAEL E. HAGLUND
                            Haglund Kelley LLP
3                           200 SW Market Street
                            Suite 1777
4                           Portland, OR 97201

5

6    FOR THE PLAINTIFF:     SHENOA L. PAYNE
                            Haglund Kelley LLP
7                           200 SW Market Street
                            Suite 1777
8                           Portland, OR 97201

9

10   FOR THE DEFENDANT:     GERALD L. WARREN
                            Law Office of Gerald Warren
11                          901 Capitol Street NE
                            Salem, OR 97301

12                          _____
13   COURT REPORTER:        Jill L. Erwin, CSR, RMR, RDR, CRR
                            Certified Shorthand Reporter
14                          Registered Merit Reporter
                            Registered Diplomate Reporter
15                          Certified Realtime Reporter

16                          United States District Courthouse
                            1000 SW Third Avenue, Room 301
17                          Portland, OR 97204
                            (503)326-8191
18

19                              *    *    *

20

21

22

23

24

25

TRANSCRIPT OF PROCEEDINGS

DEPUTY COURTROOM CLERK:  All rise.

THE COURT:  Good morning.

MR. HAGLUND:  Good morning, Your Honor.

MS. PAYNE:  Good morning.

THE COURT:  All right.  We're here on the record on defendant's motion to dismiss and plaintiff's motion to amend.  Defendant's motion is docket number 11.  Plaintiff's motion is docket number 16.

Mr. Haglund, it seems to me, looking at the briefs and the cases, there has to be an immediate threat of harm. Now, in a -- in isolation, that phrase is subject to interpretation, certainly; but as the cases have defined its borders, the definition seems to exclude the harm that the plaintiff describes these intersections present.

So why don't you address that first.

MR. HAGLUND:  Certainly, Your Honor.  In fact, the courts have been pretty clear that when you look at immediate threat of imminent harm, that those words are really a far cry from the actual standard applied.  And I'd call your -- I'll point out, first, that the defendants in their reply, make the point -- and I quote from their reply brief -- standing -- it's along the lines of what you said, too, Your Honor -- standing does not depend on a credible threat, but on injury, in fact, that is actual or imminent,

1    and Jarlstrom's allegations show that there is no real

2    threat.  However, the -- if you look at the Ninth Circuit

3    case in the environmental -- in *NRDC v. EPA*, which came down

4    late last year --

5                  THE COURT:  Right.

6                  MR. HAGLUND:  -- and it's consistent with a great

7    body of environmental cases.  It's a case where, Your Honor,

8    the EPA was proposing to register two pesticides.

9                  THE COURT:  Right.

10                 MR. HAGLUND:  And the -- ultimately, you have a

11   very similar situation.  There was only what the court

12   characterized as a probabilistic harm that the children of

13   the members of NRDC would be exposed to textiles that were

14   treated with these two pesticides, and the Court made it

15   really clear that standing based upon -- in this instance it

16   was a potential exposure to certain pesticides in clothing.

17   Here, Mr. Jarlstrom has made some pretty detailed

18   allegations, at least in our amended complaint, about the

19   potential exposure to the risk of injury or death transiting

20   Beaverton intersections with yellow light intervals that are

21   too short.

22       And in the *NRDC* case the Ninth Circuit held that where

23   there's a credible threat of a probabilistic harm,

24   Your Honor, the actual or imminent injury test is met.  And

25   I'd like to just quote their precise language.  In *NRDC* they

say, quote, We have consistently held that an injury is actual or imminent, quoting that phrase, where there is a credible threat that a probabilistic harm will materialize.

And I think that the *NRDC* case -- and then there's a whole host of environmental cases where environmentalists will allege in their complaints that their members visit a national forest, and if the thinning is too aggressive, it's going to have an impact on the nature of their experience.

It's -- here we have, I think, a case that's very much controlled by *NRDC v. EPA*, because here we have the same kind of probabilistic, and you can argue, somewhat remote harm that these parents were -- of -- these NRDC parents were complaining their children would be exposed to, because they wouldn't be able to, with much precision, figure out whether some of the clothing they bought happened to have these pesticides.

THE COURT:  Is there a difference, though, between *NRDC*, the facts, and the facts of this case, in this sense: In *NRDC*, the source of the harm at issue were pesticides, which have been or were proven to be toxic?  Now, we can debate whether and to what extent the exposure to the pesticide is needed -- I mean, how long, how much, over what period of time -- but there seemed to be no dispute in that case that the source of the harm at issue, in fact, was proven to be harmful.

1    In your case, you have an intersection which has not

2  proven to be harmful.  What we have are the plaintiff's own

3  calculations based on data acquired over an approximate

4  nine-month period about the intervals of the yellow-to-red

5  light sequence.  But there's nothing in his complaint and

6  nothing in any of the materials that's been filed that

7  indicates that these intersections he's studied have a

8  higher incidence of accidents either vehicle-to-vehicle or

9  vehicle-to-pedestrian or vehicle-to-cyclist.  It is only

10  theory.  There's no actual data that the source of the harm

11  has actually been proved to cause harm.

12         MR. HAGLUND:  Well, Your Honor, I would make two

13  points.  First, I don't believe that at the motion to

14  dismiss stage one has to have proof, and I don't think that

15  was the situation in the *NRDC* case where they --

16         THE COURT:  This is different, though.  Sorry to

17  interrupt, Mr. Haglund.

18         MR. HAGLUND:  Sure.

19         THE COURT:  But if we're going to talk about it, I

20  think we need to talk about it -- well, I was going to say

21  correctly, but let me say this:  We're not talking about

22  whether factual plausibility, under *Twombly* and *Iqbal*, is

23  satisfied as -- is the typical motion to dismiss analysis.

24  You have a standing issue here.  That sort of shifts the

25  focus from whether you've got enough facts to state a

1  plausible claim, to whether you have standing.

2      And now what you -- now what has happened is the

3  parties have submitted material in support or in opposition

4  to this motion.  I have to look at the facts, and there

5  aren't any facts, either alleged in the complaint or

6  provided with any of the materials the plaintiff has filed,

7  to show that the intersections studied actually have

8  experienced a higher incidence of accidents that then has

9  been causally connected to the shortened interval that the

10  plaintiff claims is improper, incorrect, dangerous,

11  whatever.  Much unlike pesticides, which, in the *NRDC* case,

12  I think there was no dispute.  Pesticides are bad if exposed

13  over a period of time or whatever.  But there was no issue

14  about the source of that being a possible harm.

15      MR. HAGLUND:  Well, I have a little trouble with

16  the distinction.  I agree with pesticides there's no

17  question there's harm, but I think it is also true that

18  there's no question that if one is struck by an automobile,

19  either as a pedestrian or a passenger or as a driver, that

20  there's serious risk of injury or harm.

21      And I point out that in the proposed amended complaint

22  we actually allege in paragraph 18, in our proposed amended

23  complaint, that the short duration of the yellow light

24  intervals is the direct cause of a significant number of

25  accidents at signal light intersections within the city of

1  Beaverton.

2          THE COURT:  But that's a conclusory allegation.

3  There's no allegation, for example, that says during the

4  period studied the number of accidents at this intersection

5  exceeded by 50 percent or 20 percent or were a certain

6  number compared to the average of comparable intersections.

7  There's nothing like that.  And I am required to take --

8  well, actually not.  In a typical motion to dismiss case,

9  under *Twombly* and *Iqbal*, well pleaded allegations are taken

10  as true, unless they're conclusory.  But here you don't get

11  that benefit.  And there's nothing in any of the material

12  submitted to -- here's -- here's the ultimate point:

13  Nothing to move the facts alleged into the realm under even

14  the *NRDC* case where that credible threat can be either

15  properly alleged or reasonably inferred based on the

16  allegations.  It's simply numbers on a page, theoretical,

17  that have not been proved through any actual incidents.  And

18  that's my concern.

19          MR. HAGLUND:  Well, Your Honor, I beg to differ

20  with you in one respect.

21          THE COURT:  Okay.

22          MR. HAGLUND:  You're indicating that for purposes

23  of the inquiry into standing here that you -- the Court is

24  not required to take as true all of the allegations in our

25  complaint and to give those allegations all the inferences

1    that could be given in favor of the plaintiff.  And I would

2    refer Your Honor to the Ninth Circuit case of *Maya v. Centex*

3    *Corporation*, 2011, which cites to the Supreme Court case of

4    *Warth v. Seldin*, and I'm quoting it:  For purposes of ruling

5    on a motion to dismiss for want of standing, both the trial

6    and reviewing courts must accept as true all material

7    allegations of the complaint and must construe the complaint

8    in favor of the complaining party.

9         So the fact that Mr. Jarlstrom, who's a very capable

10   engineer, as reflected in the exhibit that he personally

11   prepared, that's attached to the complaint, and if you look

12   at the more detailed allegations in the amended complaint,

13   which I believe is appropriate, given the stage of -- early

14   stage of this case --

15             THE COURT:  Right.

16             MR. HAGLUND:  -- I think we meet the test where

17   you have to take those allegations as true.

18        I don't think that it's a proper distinction to -- to

19   look at NRDC and say the pesticides' potential exposure,

20   which is, you know, arguably hypothetical, remote,

21   conjectural, but, you know, definitely could happen and met

22   the probabilistic test that is -- I think the bar is really

23   quite low for standing in the United States and in the Ninth

24   Circuit, and I don't think that -- that you can really

25   differentiate -- where we have allegations that these light

1   intervals are too short and they expose the plaintiff to the

2   risk -- imminent risk of injury or death and that there are

3   more accidents, as noted in paragraph 19.  I think we meet

4   the test, Your Honor.  Especially where everything has to be

5   taken as true at this stage, plus reasonable inferences.

6           THE COURT:  Is it your position that the

7   allegation of more accidents at these intersections is not a

8   conclusory allegation?

9           MR. HAGLUND:  No.  I do -- we do take that

10  position, Your Honor, because we -- unfortunately, discovery

11  has been stayed.  We're confident that once we get access to

12  the accident data that the City has, we'll be able to

13  provide substantial proof of our position.

14          THE COURT:  If that were the standard, *Twombly* and

15  *Iqbal* would be irrelevant, because you could file a lawsuit,

16  make allegations, very generally, of "the defendant was

17  negligent; the product is defective; the doctor committed

18  malpractice," and then immediately move to discovery to try

19  to prove up those.

20          *Twombly* and *Iqbal* requires, precisely, to avoid, in

21  part, unnecessary expense in discovery.  It requires

22  pleading plausible claims.  And that's why I ask, if -- if

23  you're going to rely on the motion to dismiss standard, I

24  can't ignore *Twombly* and *Iqbal*.  And those cases are clear

25  that conclusory allegations need not be accepted as true.

1    They have to be well pleaded.

2        If you're going to disagree that on a standing

3    challenge the standard is no different than the whole

4    standard has to be taken into account and there's certainly

5    no allegations in the complaint that the plaintiff actually

6    did experience an accident, did receive a ticket, did have a

7    remiss experience.  There's nothing there.  It's simply a

8    conclusory allegation there were more accidents here, but no

9    specific allegations to demonstrate two things:  That there

10   were more allegation -- sorry, there were more accidents,

11   and those accidents were causally connected to the shorter

12   lights.

13            MR. HAGLUND:  Well, Your Honor, I'm sure we can

14   make even more specific allegations along those lines, but

15   we do not -- I would concede that paragraph 19 does not go

16   into that level of detail.  I wouldn't characterize it as a

17   completely conclusory paragraph, but I would acknowledge

18   here that it does not have that level of specificity.

19            THE COURT:  All right.  Thank you.

20            MR. HAGLUND:  If we're allowed to amend, we can

21   address that.

22            THE COURT:  Okay.  Thank you.

23       So, Mr. Warren, how does one distinguish *NRDC* from the

24   facts here?

25            MR. WARREN:  Your Honor, I believe that *NRDC* is

1   part of the cases that talk about the capable of repetition

2   doctrine.  I think that -- because, as the Court said, the

3   pesticides have been proven to cause harm.  And they -- they

4   cite in their materials that all they have to do is show a

5   threat -- a credible threat of future injury.  And that's

6   part of that coin of "capable repetition" for the standing

7   doctrine where there'd been a past injury or facts that

8   would show something that would cause an injury, perhaps,

9   that -- that -- then the standing may have a relaxed show of

10  credible threat of future injury -- injury standard.

11      A case that came out two weeks ago in the Ninth Circuit

12  was *Coons v. Lew*, and I just have the Westlaw cite for it,

13  Your Honor.  It's 2014 WL3866475.  It was filed on

14  August 7th.  There was two orthopedic surgeons challenging

15  the Affordable Care Act, and they alleged substantive due

16  process grounds and all that, but the Court said -- with

17  regard to standing, said "We've repeatedly reiterated that

18  threatened injury must be certainly impending to constitute

19  injury in fact and that allegations of possible future

20  injury are not sufficient."

21      And that, we believe, is the standard that the Court

22  needs to apply for the standing in this case; that the *NRDC*

23  cases and the *City of Los Angeles v. Lyons* case that they

24  relied upon is a situation where there's been a prior

25  injury -- the chokeholds in the LA case -- and then you have

to show there's a credible threat of future injury.

In this case we agree with the way the Court seems to be headed; that the, you know, facts here, at best, show a generalized threat of harm, and that case of -- the Supreme Court case of Warth -- I think this is in my brief -- *Warth*, W-A-R-T-H, *v. Seldin*, S-E-L-D-I-N, 422 U.S. 409. It's a 1975 case. But it was a zoning and land ordinance case where low income and moderate income people might have been affected, and the Court had a generalized grievance of -- that might apply to a large class of citizens doesn't result in standing.

And that's, at best, what they have is -- there's been no particularized injury alleged to Mr. Jarlstrom, even in the future materials they don't, so we think they fall back to it's not a "capable of repetition" type standing issue. It's an injury in fact. And it's not a certainly impending injury sufficient to constitute standing.

THE COURT: Well, let's talk about the capable of repetition.

One thing the complaint does seem adequately to allege is these yellow lights consistently cycle to red on a shortened interval. It's not that they occasionally happen, but all of a sudden you're going to an intersection you've gone through for the last three or six months, used to a particular light cycle, and all of a sudden the light cycles

1   from yellow to red in half the time that it normally does.

2       What the complaint alleges, I think, with -- at least

3   on this piece, sufficient specificity, is it's always doing

4   this and the interval is too short and apparently too short

5   under the plaintiff's reading of vehicle code or whatever

6   other regulations apply.

7       Why doesn't that meet the "capable of repetition"

8   requirement?

9           MR. WARREN:  Well, there's been no injury.  In all

10  the "capable of repetition" cases, the LA chokeholds, the

11  gentleman had been choked upon the traffic stop.  In the

12  *Ibrahim* case the person was on the no-fly list and had been

13  prevented from coming back to the United States.  There had

14  been an actual injury in those cases.

15      In this case, Mr. Jarlstrom doesn't allege any injury

16  at all.

17          THE COURT:  So two things:  First, there has to

18  actually have been an injury?

19          MR. WARREN:  Yes, Your Honor.

20          THE COURT:  Is that how you read the cases?

21          MR. WARREN:  Yes, sir.

22          THE COURT:  How do we square that with *NRDC*?

23          MR. WARREN:  As the Court --

24          THE COURT:  Because there were -- now, I might

25  misrecollect the facts, but I don't recall there being any

actual past injury to any of the plaintiffs or their

members -- to the plaintiff or any of its members in that

case.

MR. WARREN:  And I can't recall exactly the facts

either, Your Honor, but my recollection is that that -- it's

what the Court said:  Pesticides are a known -- known to

cause injury and have caused injury.  And I guess maybe

that's how it would fit in the "capable of repetition."

It's a known carcinogen or whatever.  And therefore the

standing may have been -- still not relaxed to the point

that they have -- we don't believe have made it, but the bar

might be a little lower in those cases where you've got the

carcinogen, or whatever, the pesticide activity.

But in the cases that are real clear about the "capable

of repetition" doctrine, you know, the incredible threat of

future injury does require that there have been an injury.

And Mr. Jarlstrom doesn't have any injury.

And, like I cited in the *Coons v. Lew*, it has to be

certainly impending to constitute an injury in fact, and

merely alleging -- we don't believe that others have had

accidents at the intersection makes it impending to

Mr. Jarlstrom, who's the plaintiff.

THE COURT:  Well, let's go back to *NRDC*.  If our

assumption is correct that past injury to others was the

basis for finding pesticides harmful and therefore capable

1   of repetition going forward, wouldn't that suggest that

2   Mr. Jarlstrom himself doesn't actually have to have been

3   involved in an intersection collision there as long as

4   others were?

5          MR. WARREN:  Well, Your Honor, I would like to

6   submit a subsequent brief if it were -- a supplemental brief

7   that would help the Court, because I don't have that case in

8   front of me, and I would like to review the facts and the

9   distinction for standing purposes and analyzing whether they

10  had standing in this case or not.  And certainly in the

11  constitutional claim they allege is a state-created danger.

12  I don't know how you even get that with the facts that they

13  have that they somehow have been put in danger.  That's --

14  that should be on standing.  But I prefer to submit a

15  supplemental memorandum, if the Court wants me to

16  distinguish that case.

17          THE COURT:  All right.  Thank you.

18      Mr. Haglund, anything else on standing?

19          MR. HAGLUND:  Well, I just would point out that I

20  do have the *NRDC* case, and I reviewed it carefully before

21  this argument.  There's nothing in it to suggest that you

22  have to have an actual injury to the plaintiff.  The key is

23  a very low bar and injury is actual or imminent where

24  there's a credible threat that a probabilistic harm will

25  materialize.  And that's the quote from the case.

1    And there was absolutely no -- I know the facts of

2  *NRDC*.  There was nothing in the record there indicating that

3  any one of the children of the NRDC parents -- the NRDC

4  members who were the plaintiffs -- that there had been any

5  contact yet with any textile that conveyed this

6  conditionally registered pesticide.

7          THE COURT:  All right.  So let's talk about --

8  let's move from standing to federal question.

9    We have a stoplight at a city intersection that the

10  plaintiff alleges cycles too quickly from yellow to red.

11  What's the federal right implicated by that, Mr. Haglund?

12          MR. HAGLUND:  We made it very clear in our papers,

13  Your Honor, that the federal right is that if the City of

14  Beaverton, which has had the opportunity to consider whether

15  or not to correct this problem, it's made the considered

16  choice not to address this problem and, as a result, has put

17  the plaintiff in risk of potential injury or death

18  transiting these intersections.

19    And we cite the case law that makes it very clear that

20  in that sort of situation you meet one of the exceptions

21  that allows you to assert this as a Section 1983 claim and a

22  violation of substantive due process.

23    The LA chokehold case is an example of -- well, in that

24  case, actually, standing was not found, because there it was

25  just too -- the probabilistic harm standard was not met.

1  But there are multiple cases that we cited in our papers,

2  where, if -- if the City makes a particular decision, then

3  it is -- that puts the plaintiff at -- in imminent danger,

4  then the Section 1983 claim will lie.

5      One case that is a recent case, that -- we didn't cite

6  it for this proposition, but it helps address your point,

7  Your Honor, and that is the case in this district that came

8  down last year.  It's the *Hammel v. Tri-Met* case that we

9  cited in our opposition for other reasons, but it gets to

10  your point.  That's the case -- the very unfortunate

11  situation where the Tri-Met bus driver hit five people

12  making that --

13          THE COURT:  Right.

14          MR. HAGLUND:  -- I think it was a left-hand turn.

15          THE COURT:  Yes.

16          MR. HAGLUND:  And the Court found there that the

17  deliberate -- actual deliberation test was met, and the

18  statement by Judge Mosman there -- and I quote -- is in such

19  cases the Court will find a substantive due process

20  violation if the state actor consciously disregards a

21  substantial risk of serious harm.  And we -- you don't have

22  to have a federal actor.

23      It's -- there are -- I've handled a number of Section

24  1983 cases that don't involve federal actors.

25          THE COURT:  They don't have to involve federal

1   actors.  They can involve state actors, but there still has

2   to be a federal right that's infringed.

3              MR. HAGLUND:  Right.  As we point out in our

4   papers, I think, very clearly, if a state government -- in

5   this case, the City of Beaverton makes the considered choice

6   that it did here, to not change these light intervals after

7   Mr. Jarlstrom has made -- we -- our proposed amended

8   complaint goes into more detail on this -- the number of

9   times he's been before the counsel, the data that he's

10  provided to them.

11             THE COURT:  I saw all that.

12             MR. HAGLUND:  You saw all that?

13             THE COURT:  Yes.

14             MR. HAGLUND:  Where they make that considered

15  choice, they fall.  And then the only other item we have to

16  demonstrate is that it does give -- that we have -- we meet

17  the standing test that there's this imminent risk of -- that

18  there's a credible threat of serious harm to our client.

19             THE COURT:  All right.  Thank you.

20      Mr. Warren?

21             MR. WARREN:  Your Honor, I guess they have to meet

22  the test that it shocks the conscious of this Court in order

23  to get the substantive due process, and I don't see how the

24  facts in this case would rise to that level.  The fact is

25  the City's looked at the state law and looked at the

1   analysis that Mr. Jarlstrom has provided, and they disagree.

2   So there's a disagreement that might be resolved at the

3   state legislature, but the local political body is not

4   convinced that Mr. Jarlstrom's data is correct.

5       So is that the type of conduct that shocks this Court's

6   conscious?  We don't think it is.  And as they acknowledge

7   in one of their footnotes, nobody has found a case along

8   these lines that would suggest that a state-created danger,

9   which apparently is the 14th Amendment, substantive due

10  process provision they relied upon, that they could be

11  expanded this far.  And we don't believe that it should be a

12  federal claim.

13      THE COURT:  Not expanded this far because it's not

14  the type of danger or for some other reason?

15      MR. WARREN:  Well, typically, in the substantive

16  due process you have some -- some actor, state acting color

17  of law, who's placed a person in greater danger than what

18  they otherwise have found themselves in.

19      And the danger, then, results in some actual injury,

20  and, I mean, I'm very familiar with all the substantive due

21  process cases, because it comes up quite a bit in all the

22  police cases that I defend, and you have the cases of the --

23  where 911 is called and they -- the gentleman, instead of

24  police allowing the medics to come in, they put him inside

25  the house, they lock it up and call off the ambulance, and

he dies during the night. There was a danger created by the conduct of what they did.

In this case the City believes they're following state law. They believe the timing is accurate, and they haven't created any danger greater to him than they believe they have anybody else. They put traffic lights in and they control them in the manner they do for safety reasons. And so how that can then be turned to creating some danger just doesn't seem to fit in any federal question or any substantive due process case that I've seen.

THE COURT: That seems more -- because, as you point out, the parties have a dispute. But that seems more to the merits of the underlying disagreement between the sides.

What I'm looking at is -- I'll use the phrase that you've used, and I know the plaintiff has disagreed with the applicability of this, but let's use "shocks the conscious." When I look at that, because this is a motion to dismiss -- a motion to dismiss, isn't -- isn't my assessment to be based on what's well pleaded in the complaint? And what's pleaded in the complaint is you have a yellow light that cycles faster to red than state law or regulations permit. And if that happens, the chances of vehicles colliding in that intersection logically increase, and the City knows that, and they're not doing anything to change it. So I'm

1    not opining on the merits.  I'm just looking at the

2    allegations, because that's where we are at this stage.

3         How does the City's knowledge of the possibility of

4    increased accidents at this intersection and not changing

5    the light intervals, how does that not meet the "shocks the

6    conscious" tests at this stage?

7              MR. WARREN:  Well, then I think anything can meet

8    the "shocks the conscious" test, because they haven't

9    established that the City of Beaverton was presented with

10   all these statistics showing accidents happening as a direct

11   result of the timing that they allege is incorrect, which,

12   again, we dispute.  That does get to the merits.  I agree.

13   They talked a little bit about the merits.  I'm just

14   presenting that to the Court.

15        I understand it's not relevant to your analysis, but

16   the "shocks of conscious" standard when they haven't alleged

17   that the City of Beaverton was presented with all this data

18   and accidents at this intersection and, yet, they've

19   deliberately ignored that.  And, therefore, he has an injury

20   or he has a credible threat of future harm if that's what

21   the Court thinks the test is.  Then maybe that is enough to

22   shock the conscious.

23        But there's a disconnect between his conclusory

24   language and anything that's been presented to the City to

25   show they've been deliberately indifferent.  He even alleges

he went there and presented testimony and they disagreed. All he's shown is that there's a disagreement in the timing that should govern that light and what the motor vehicle code says.

If we get to the merits, ultimately, you know, we'll get to those other things I brought up. But the fact is at this stage there's some step missing before it ought to shock this Court's conscious. And that is what the City of Beaverton actually was told about actual accidents. Not just because they allege it's -- there's a chance, or whatever the language they use in paragraph 18, significant accidents. He didn't turn around and say "we presented all that data and they've done nothing to it with that, so therefore they're deliberately indifferent to the harm that I'm facing."

So it seems they're missing a step before it ought to shock conscious of the federal court.

THE COURT: All right. Thank you.

Mr. Haglund, anything else on that?

MR. HAGLUND: Your Honor, I would just add that the key case law we cite for purposes of this being a legitimate Section 1983 claim is the -- it's on pages 10 and 11 of our opposition, where we note that the Fourteenth Amendment, in a number of cases holds that citizens are protected against unjustified intrusions on personal safety.

1    And although a state actor does not have a constitutional

2    duty to protect parties from harm from third parties, there

3    are two exceptions to that general rule.  The special

4    relationship exception, which is not applicable here, and

5    the danger creation exception, which is what we contend does

6    apply here.  And the only other point I'd make is the

7    "shocks the conscious" standard has been determined to be

8    equivalent to the deliberate indifference test, which in

9    multiple cases you see the courts concluding that if the

10   state actor has had the chance to reconsider or step back

11   from a decision previously made and then refuses to do so,

12   that that is a deliberate decision by them and can qualify

13   for the deliberate indifference, provided you also have the

14   danger creation exception met, which we think we do here.

15          THE COURT:  The danger that exists, exists, in

16   part, because of the presence of vehicles on the road;

17   correct?

18          MR. HAGLUND:  Yes.

19          THE COURT:  All right.  I know this is a little

20   bit silly, but, you know, humor me.  If nobody drove through

21   that intersection, it wouldn't matter how quickly the light

22   cycles went from yellow to red.  People just don't drive

23   through it; right?  I know that's extreme, but, I mean --

24          MR. HAGLUND:  I do not disagree with that.

25          THE COURT:  You have to have the cars --

1          MR. HAGLUND:  Right.

2          THE COURT:  -- to create the danger.

3      It's not just the light and it's not just the cars.

4  It's both.  Would you agree?

5          MR. HAGLUND:  Yes.

6          THE COURT:  The fact that third parties, members

7  of the public driving vehicles through the intersection,

8  contribute to the danger, does that make a difference or

9  does that not make a difference with respect to the creation

10  of the danger exception.

11          MR. HAGLUND:  I don't think it makes a difference.

12  What we have here is a situation where -- the City of

13  Beaverton, like every municipality in the state of Oregon,

14  has to make its own decisions about how to time its yellow

15  light intervals.  If they're done in a way that's

16  fundamentally done outside the zone of what the best and

17  safest practices will be, which will prove, ultimately, then

18  when they take on the duty to control intersections as part

19  of their police power, for the benefits of their citizens

20  and keeping those intersections as safe as reasonably

21  possible, when they don't meet the test of the best

22  practice, they are exposing their citizens to an increased

23  risk of danger of injury or death.  We think that squarely

24  falls within this danger creation exception.

25      They are -- the fact that they are acting to control

third-party behavior, namely folks driving through or
walking across intersections, is -- is appropriate; but
it -- if they deliberately make a decision that they won't
step back from doing it wrong and it does create danger, as
alleged in our complaint, we're entitled to proceed further.
And if we prove up our case down the road, we'll be entitled
to injunctive relief.

THE COURT: All right. Thank you.

All right. Those are the questions I had. I will let
each of you add whatever in addition you have to say that
you haven't had a chance to say in response to my questions.

Mr. Warren, it's your motion, at least on the motion to
dismiss, so go ahead.

MR. WARREN: Did you say add anything that I want
to say at this point?

THE COURT: Anything you haven't had a chance to
say yet. Keep in mind I've read everything.

MR. WARREN: Yeah. No, Your Honor. The only
thing. I don't know if it -- is the Court just addressing
the first motion now? The motion to dismiss?

THE COURT: Yeah. Giving you a chance to add
anything else you want to add on the motion to dismiss?

MR. WARREN: No, Your Honor.

THE COURT: Okay. On the motion to dismiss,
Mr. Haglund?

1          MR. HAGLUND:  Your Honor, we've made all our

2     points.

3          THE COURT:  All right.  What about on the motion

4     to amend?  Anything else?

5          MR. HAGLUND:  No.  I think the standard is clear

6     that at this stage of the case leave should be freely given

7     to amend a complaint.  In this district, my experience is

8     that at this stage that motion should absolutely be granted.

9     So we'll rest on our papers.

10          THE COURT:  All right.  Mr. Warren, anything on

11     the motion to amend?

12          MR. WARREN:  Well, Your Honor, I think we made the

13     point, but there is another case on it.  The legal basis for

14     the cause of action is tenuous, as we ask the Court to find,

15     the futility would support denying the motion to amend.

16     Futility alone, you wouldn't have to add -- look at all the

17     other factors.  And that's *Morongo Band of Mission Indians*

18     *v. Rose*, Ninth Circuit, 1990 case, 893 F2d 1074.  We did

19     cite a similar case in our materials, but that one actually

20     says that principle where the legal basis for the cause of

21     action is tenuous, futility supports refusal to grant leave

22     to amend.

23          THE COURT:  Thank you.  All right.  Thank you very

24     much.  The arguments were helpful.  I'll take it under

25     advisement.

1        MR. HAGLUND:  Thank you, Your Honor.

2        MR. WARREN:  Thank you.

3                (Hearing concluded.)

1                    C E R T I F I C A T E

2

3   MATS JARLSTROM,an individual,        )
                                         )
4                       Plaintiff,  )Case No. 3:14-cv-00783-AC
                                         )
5                    v.                  )
                                         )
6   CITY OF BEAVERTON, an Oregon         )
    municipal corporation,               )
7                                        )
                        Defendant.  )
8   _____)

9

10

11                      MOTION HEARING

12                      August 25, 2014

13

14          I certify, by signing below, that the foregoing is

15   a true and correct transcript of the record of proceedings

16   in the above-entitled cause.  A transcript without an

17   original signature, conformed signature, or digitally signed

18   signature is not certified.

19

20   /s/Jill L. Erwin, CSR, RMR, RDR, CRR
    _____
21
    Official Court Reporter          Date: September 5, 2014
22

23

24

25